## Case No. 25-3164

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

JESSICA COMBS, an individual,
*Plaintiff-Appellant,*

v.

NETFLIX, INC.,
a Delaware Corporation Registered with the California Secretary of State,
*Defendant-Appellee.*

*On Appeal from the United States District Court for the Central District of California (Los Angeles),
Case No. 2:24-cv-09037-MRA-MAA • The Honorable Monica Ramirez Almadani, District Judge*

## APPELLANT'S OPENING BRIEF

EDWIN B. BROWN
**BROWN & STEDMAN LLP**
22342 Avenida Empresa, Suite 125
Rancho Santa Margarita, California 92688
Telephone: (949) 459-5900
ed@brownstedmanlaw.com

*Counsel for Plaintiff and Appellant*


COUNSEL PRESS · (800) 3-APPEAL      PRINTED ON RECYCLED PAPER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

ISSUES PRESENTED................................................................................1

INTRODUCTION .......................................................................................1

JURISDICTIONAL STATEMENT .............................................................5

STATEMENT OF FACTS ..........................................................................5

STATEMENT OF THE CASE.....................................................................8

SUMMARY OF ARGUMENT ....................................................................9

STANDARD OF REVIEW ..........................................................................9

ARGUMENT ............................................................................................11

    I.      The EFAA Applies to Prevent Arbitration of
          Combs' Claims ....................................................................11

    II.     The District Court Erred by Not Following
          the *Kader* Decision...........................................................16

    III.    The District Court Mischaracterized
          Pre-2022 Conduct as a "Dispute"........................................20

    IV.    Arbitration Should Be Denied Because the Core
          of the Case is Sexual Harassment .......................................21

    V.     Policy Considerations Support Denial of Arbitration .........21

CONCLUSION.........................................................................................22

CERTIFICATE OF COMPLIANCE..........................................................23

STATEMENT OF RELATED CASES........................................................24

ADDENDUM ...........................................................................................25

i

## TABLE OF AUTHORITIES

**CASELAW**

*Armendariz v. Foundation Health Psychcare Services, Inc.*
(2000) 24 Cal.4th 83 ................................................................17, 18

*Arouh v. GAN Ltd.*,
No. 8:23-CV-02001- FWS,
2024 WL 3469032 (C.D. Cal. Mar. 22, 2024)........................... 14-15, 21, 22

*Ashbey v. Archstone Prop. Mgmt., Inc.*,
785 F.3d 1320 (9th Cir. 2015) .......................................................10

*Cox v. Ocean View Hotel Corp.*,
533 F.3d 1114 (9th Cir. 2008) .......................................................10

*Doe v. Second St. Corp.*,
(2024) 105 Cal.App.5th 552 ..........................................................11

*Famuyide v. Chipotle Mexican Grill, Inc.*
(8th Cir. 2024) 111 F.4th 895 ....................................................15, 20

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000) ...............................10

*Hansen v. LMB Mortg. Servs., Inc.*,
1 F.4th 667 (9th Cir. 2021) ..........................................................10

*Johnson v. Everyrealm, Inc.*,
657 F. Supp. 3d 535 (S.D.N.Y. 2023) .................................................14

*Kader v. Southern California Medical Center, Inc.*
(2024) 99 Cal.App.5th 214 ......................................................*passim*

*Munro v. Univ. of S. Cal.*,
896 F.3d 1088 (9th Cir. 2018) .......................................................10

*Newcombe-Dierl v. Amgen*,
2022 WL 3012211 (C.D. Cal. May 26, 2022)...........................16, 18, 19, 20

*Papaconstantinou-Bauer v. Jackson Hosp. & Clinic, Inc.*
(M.D. Ala., Mar. 18, 2024, No. 2:22cv178-MHT) 2024 WL 1158362 ..12, 13

*Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*,
     636 F.2d 51 (3d Cir. 1980) ...................................................................................10

*State ex rel. Cisneros v. Alco Harvest, Inc.*
     (2023) 97 Cal.App.5th 469 .............................................................................9, 21

*Turner v. Tesla, Inc.*,
     686 F. Supp. 3d 917 (N.D. Cal. 2023) ...................................................15, 21, 22

**STATUTES**

28 U.S.C. § 1291 ...........................................................................................................5

28 U.S.C. § 1332 ...........................................................................................................5

9 U.S.C. § 2 .................................................................................................................13

9 U.S.C. § 402 ...............................................................................................3, 11, 14

9 U.S.C. § 402(a) .........................................................................................................14

Cal. Civ. Code § 43 .......................................................................................................8

Cal. Civ. Code § 1708 ...................................................................................................8

Cal. Code Civ. Proc. § 1294 .........................................................................................9

Cal. Const. Art. 1 § 8 ....................................................................................................8

Cal. Gov. Code § 12900 *et. seq.* ..................................................................................8

Cal. Gov. Code § 12940(a) ...........................................................................................8

Cal. Gov. Code § 12940(h) ...........................................................................................8

Cal. Gov. Code § 12940(k) ...........................................................................................8

California Labor Code § 1102.5 .....................................................................................8

**RULES**

Federal Rule of Civil Procedure 56 .............................................................................10

iii

**MISC**

Black's Law Dictionary (11th ed. 2019) ...............................................................15

House Judiciary Committee Report (H.R. Rep. No. 117-234).........................11, 12

Merriam-Webster's Unabridged Dictionary (Merriam-Webster,
https://unabridged.merriam-webster.com/unabridged/dispute
(last visited Oct. 16, 2023) ............................................................................... 12-13

Pub.L. No. 117-90 § 3, 136 Stat. 26 (2022).........................................................14

## ISSUES PRESENTED

**Issue 1**: Did Plaintiff and Appellant Jessica Combs' ("Combs") dispute arise: (1) when Defendant and Appellee, Netflix, Inc. ("Netflix") committed the alleged sexual harassment; (2) when Netflix fired Combs; or (3) when Combs filed her complaint with the California Department of Fair Employment and Housing?

**Issue 2**: Does Netflix's silence and failure to acknowledge Combs' complaints amount to a "dispute" under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA")?

**Issue 3**: Does an employer's silence in response to a complaint equal conflict?

**Issue 4**: Does the EFAA apply to this case to nullify the mandatory arbitration provision in Combs' employment agreement with Netflix?

**Issue 5**: If the EFAA applies to Combs' dispute with Netflix regarding her claims of sexual harassment, did the district court commit prejudicial error by granting Netflix's motion to compel arbitration?

## INTRODUCTION

In 2017, Netflix hired Combs to work in Netflix's Los Angeles office. Combs was subjected to sexual harassment from Netflix management and fellow Netflix employees. For example, Netflix required meetings and overnight off-sites

1

where employees were expected to meet and interact in a way that promoted personal interaction and activities, some of which were akin to "speed dating."

Combs, as well as other female employees were made to endure sexual harassment and a sexually charged workplace that was not only patently offensive and harmful, but almost impossible to comprehend. As an example, the "stairs of shame" was a staircase employees were required to traverse between ground and higher floors. These stairs were constructed in a way that subjected women wearing dresses and skirts to unwanted leering and probing eyes from those, generally men, standing beneath them. Females wearing a skirt or dress were therefore subjected to the unwanted and invasive prying eyes of male coworkers. Males would often congregate at the lower level of the staircase and banter about their observations. This was a widely known occurrence that was accepted and joked about at Netflix.

Combs wanted no part in such activities but had no option aside from acquiescing for fear of losing her job. At all times that Combs was employed by Netflix, the company was also aware that Netflix employees often made crude and sexually charged comments yet did nothing to curtail such harmful activity.

In 2021, Netflix mandated that all Netflix employees receive the Covid vaccine. Combs exercised her constitutional right to decline receiving the Covid vaccine for religious reasons.

2

Throughout 2021, Combs was not working in Netflix's Los Angeles office, as the office remained closed since March 2020. She was working remotely from her home in Tennessee with approval by Netflix management on condition that she would return quarterly or on an as-needed basis. Therefore, Combs was of no physical threat to her fellow colleagues. Combs offered to take a Covid test before entering Netflix in Los Angeles, should she need to visit that office. This request was denied. Additionally, Combs requested her office location be changed from Los Angeles to London with the hope that Covid testing would be available. This request was also denied. Despite her cooperative stance and outstanding work performance, Combs was summarily terminated for not complying with the ultimately unlawful vaccine mandate. Combs alleges that Netflix's use of the Covid vaccine mandate, as the sole reason for her termination, was pretextual.

Combs' written employment agreement with Netflix requires Combs to arbitrate employment-related claims against Netflix. However, in March 2022, Congress passed the EFAA, found at 9 U.S.C. § 402. The EFAA invalidates pre-dispute arbitration agreements for sexual harassment or sexual assault claims that "arise or accrue" on or after March 3, 2022.

Netflix filed a motion asking the district court to order Combs' claim to arbitration. The district court granted Netflix's motion, erroneously concluding that

Combs' claims "arose or accrued" in 2018, when she first complained to Netflix of sexual harassment, or in December 2021, when Netflix fired Combs.

In granting Netflix's motion, the district court erred in its determination of the accrual date of Combs' "dispute." Combs' dispute with Netflix over sexual harassment did not arise until March 3, 2022, when she timely filed a complaint against Netflix with the DFEH Civil Rights Department, and for which she received a Right-to-Sue Letter on August 3, 2023. Only then did Combs' "dispute" with Netflix arise.

The district court committed prejudicial error by determining that Combs' dispute with Netflix arose in 2018, when Netflix simply ignored Combs' complaints of harassment. Had the district court used the correct date of the genesis of the dispute, August 3, 2023, the court would have correctly denied Netflix's motion under the EFAA.

The district court's order removes Combs' right to have a jury of her peers decide whether Netflix violated her rights and, if so, the amount of her damages. Combs asks this Court to apply the correct accrual date for Combs' claims with Netflix and reverse the district court's order granting Netflix's motion for arbitration.

4

## JURISDICTIONAL STATEMENT

Combs filed her Complaint for damages in the Los Angeles Superior Court, the state court jurisdiction in which Netflix conducts business. The pleading named Netflix as the only defendant. Netflix removed the case to the district court where jurisdiction is proper under 28 U.S.C. §1332. This court has jurisdiction to hear this appeal under 28 U.S.C. §1291 because the appeal is of a final order from the district court.

## STATEMENT OF FACTS

Combs filed her Complaint in the Los Angeles Superior Court against Netflix on July 29, 2024 (ER-90). Plaintiff's Complaint alleges, among other claims, retaliatory termination, sexual harassment, and failure to prevent harassment.

The Complaint alleges, in relevant part, that, on or about June 2017, after Combs started working at Netflix, she learned that Netflix promoted a "flirtatious office environment that was very sexual in nature" (ER-92). Netflix encouraged one-on-one meetings for employees to get to know each other and created a culture that fostered sexually charged comments (ER-92-93).

During a work trip to Singapore in October 2018, a male colleague aggressively approached Combs and made sexual advances (ER-93-94). On or

5

about September 2018, Combs attended an off-site meeting that felt like forced speed dating, leaving Combs feeling uncomfortable and intimidated (ER-96-97).

While still employed with Netflix, Combs complained to Netflix "regarding the uncomfortable nature of the sexually charged atmosphere she and other female employees were subjected to" (ER-104). Netflix took no action to remedy the situation. Fearing that continued complaints would lead to retaliatory harassment, Combs ceased her complaints and continued to perform her job duties (*Id*).

In November 2021, prior to her termination, Combs again raised concerns about harassment and, once again, no corrective action was offered or taken (*Id)*.

The Complaint alleges that Combs was wrongfully terminated from her position with Netflix in December 2021 (ER-102). Combs timely filed a complaint against Netflix with the DFEH and received a Right-to-Sue Letter on August 3, 2023 (ER-102).

After Combs filed the instant case in state court, Netflix removed the case to federal court. Netflix subsequently moved to compel arbitration and dismiss the case on the grounds that Combs had agreed to arbitrate her claims pursuant to a written pre-employment arbitration agreement (ER-102).

In support of its motion, Netflix provided the court a copy of the employment agreement between Combs and Netflix signed on May 6, 2017, entitled "AGREEMENT REGARDING YOUR NETFLIX EMPLOYMENT"

6

(Including Mutual Agreement to Arbitrate") (the "Agreement") (ER-68). The

Agreement states in relevant part the following:

> "Let's not fight in court. Even in the best of relationships, disputes can
> arise. Rather than fighting it out in court, both you and Netflix agree
> to arbitrate under California law (including California's arbitration
> rules) any claim for breach of this Agreement and all employment
> related disputes, including claims under state or federal law. You
> further agree to waive any right to arbitrate any claim on a class,
> collective or representative basis, unless such class, collective or
> representative claims cannot be waived under applicable law. All
> claims must be brought in the name of an individual person [] and
> must proceed on an individual basis. You also agree to let the entire
> dispute be handled by the American Arbitration Association. We
> agree to pay for any administrative or hearing fees, with the
> exception of the first $250.00 of your filing fees if you decide to
> initiate the arbitration.
>
> By choosing arbitration, both of us agree that arbitration will be the
> sole remedy for any disputes between us (with the exception of claims
> before administrative bodies), and neither of us will pursue any action
> in court, except that either of us may file an application for injunctive
> relief (or other provisional remedy) where a temporary order from a
> court may be necessary to preserve the status quo or protect the
> interests in dispute" (ER-68).

In her Opposition to Netflix's motion, Combs argued that the EFAA

precludes arbitration in her case, given her claims of sexual harassment (ER-

29).

The district court determined that Combs' dispute with Netflix

accrued in 2018 or 2020, not after the EFAA's March 3, 2023 effective date.

7

**STATEMENT OF THE CASE**

On July 29, 2024, Combs filed her Complaint against Netflix (ER-90). Plaintiff's Complaint makes the following claims: (1) discrimination (Cal. Gov. Code § 12940(a) and § 12900, *et seq.*); (2) retaliatory termination (Cal. Gov. Code § 12940(h) and § 12900, *et seq.*); (3) sexual harassment (Cal. Gov. Code § 12940(k) and §12900, *et seq.*); (4) failure to prevent harassment (Cal. Gov. Code § 12940(k) and § 12900, *et seq.*); (5) harassment (Cal. Const. Art. 1, § 8); (6) violation of California Labor Code Section 1102.5 (whistleblower statute); (7) negligence (Cal. Civ. Code §§ 43, 1708); (8) wrongful termination; (9) hostile work environment; and (10) breach of covenant of good faith and fair dealing (*Id.* ¶¶ 56-155).

Netflix removed the case to the Central District Court for the State of California on October 21, 2024. On November 8, 2024, Netflix moved to compel arbitration based on a written arbitration agreement that Netflix attached to its motion (ER-68).

Combs timely filed her opposition to Netflix's motion, arguing that the EFAA precludes arbitration in her case, given her claims of sexual harassment (ER-29).

8

On April 16, 2025, the district court granted Netflix's motion and ordered the parties to arbitrate Combs' claims (ER-3). On May 16, 2025, Combs filed her notice of appeal to this Court.

## SUMMARY OF ARGUMENT

The trial court erred by concluding that Appellant Jessica Combs' legal dispute accrued earlier than Combs' filing of her 2023 DFEH complaint, well after the EFAA's effective date. The district court's interpretation of the EFAA that Combs' claim accrued when she complained to her employer, or when she was fired, erroneously conflates internal complaints with adversarial legal disputes. Appellant Combs asks that this Court reverse the district court's order.

## STANDARD OF REVIEW

A district court's order on a petition to compel arbitration is an appealable order (Cal. Code Civ. Proc. §1294). The court of appeal reviews the granting of a petition to compel arbitration for substantial evidence or an abuse of discretion but, where the trial court's denial of a petition to arbitrate presents a pure question of law, including a question of statutory interpretation, the court reviews the order de novo (*Kader v. Southern California Medical Center, Inc.* (2024) 99 Cal.App.4th 214, 221; *State ex rel. Cisneros v. Alco Harvest, Inc.* (2023) 97 Cal.App.5th 456, 459).

9

The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence the existence of an agreement to arbitrate (*see Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015) (citing *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008)). "[T]he party resisting arbitration bears the burden [ ] of proving that the claims at issue are unsuitable for arbitration" (*Munro v. Univ. of S. Cal.*, 896 F.3d 1088, 1091 (9th Cir. 2018) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000)).

In resolving a motion to compel arbitration, "[t]he summary judgment standard [of Federal Rule of Civil Procedure 56] is appropriate because the district court's order compelling arbitration 'is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate'" (*Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n.9 (3d Cir. 1980).

The district court erroneously interpreted the EFAA's term "dispute" to include a complaint by an employee to her employer when the employer fails to acknowledge, and remains silent, as in Combs' complaints. The proper interpretation of when a "dispute" arises, as in *Kader,* is when the employee files a

10

complaint with the DFEH. This Court should review the lower court's order de novo.

**ARGUMENT**

I.     **THE EFAA APPLIES TO PREVENT ARBITRATION OF COMBS' CLAIMS**

In March 2022, Congress passed the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA"), found at 9 U.S.C. § 402. The House Judiciary Committee's report on the EFAA explained the Act's purpose as follows:

> "H.R. 4445, the 'Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021,' would prohibit the enforcement of mandatory, pre-dispute arbitration ('forced arbitration') provisions in cases involving sexual assault or sexual harassment. Over the past several decades, forced arbitration clauses have become virtually ubiquitous in everyday contracts. Often buried deep within the fine print of employment and consumer contracts, forced arbitration deprives millions of Americans of their day in court to enforce state and federal rights. Because arbitration lacks the transparency and precedential guidance of the justice system, there is no guarantee that the relevant law will be applied to these disputes or that fundamental notions of fairness and equity will be upheld in the process. Furthermore, due to the secretive nature of this system, these disputes are often shielded from public scrutiny [¶] ... [¶]" (Cited in *Doe v. Second St. Corp.*, (2024) 105 Cal.App.5th 552, 565).

The House Judiciary Committee's report continues:

> "In many forced arbitration cases, the company is entitled to choose the arbitrator who decides the case, as well as the rules of procedure and evidence that apply, and the distribution of costs of the arbitration. The rules also protect the company by keeping the records of an arbitration secret. Because the records in arbitration are protected, employers that use arbitration clauses in their employment

11

contracts can retaliate against a victim—rather than confront the harasser or the attacker—without fear of their actions becoming public through the courts. The secretive nature of arbitration also prevents victims from sharing their stories. This allows for the growth of office cultures that ignore harassment and retaliate against those who report it, prevent future victims from being warned about dangerous companies and individuals, and create incentives for the corporate protection of rapists and other serial harassers. [¶] H.R. 4445 would restore access to justice for millions of victims of sexual assault or harassment who are currently locked out of the court system and are forced to settle their disputes against companies in a private system of arbitration that often favors the company over the individual" (H.R.Rep. No. 117-234, 2d Sess., pp. 3–4 (2022), fns. omitted).

"By its terms, the EFAA applies to any dispute or claim that arises or accrues on or after the date of enactment of the statute. In *Papaconstantinou-Bauer v. Jackson Hosp. & Clinic,* Inc., No. 2:22CV178-MHT, 2024 WL 1158362, at *6 (M.D. Ala. Mar. 18, 2024), the plaintiff employee argued that her "dispute" with her employer did not "arise" when she was terminated, but rather when she filed her lawsuit in April 2022, after the EFAA became effective. The plaintiff explained that she understood a "dispute" to require an adversarial posture or disagreement between the parties and not just the existence of an injury. The *Papaconstantinou-Bauer* court agreed that "such an understanding is consistent with the ordinary meaning of the word "dispute" (*Id.,* at *1).

The *Papaconstantinou-Bauer* court cited the definition of "dispute" in Merriam-Webster's Unabridged Dictionary (Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/dispute (last visited Oct. 16,

12

2023), as a "verbal controversy: strife by opposing argument or expression of opposing views or claims: controversial discussion: debate"). Thus, the plaintiff claimed that the acts of sexual harassment and discrimination did not themselves constitute a dispute, but rather the dispute arose only once she compelled the hospital to defend itself in her lawsuit (*Id*).

The *Papaconstantinou-Bauer* court disagreed that "the dispute" arose only upon plaintiff's filing of her complaint. "Rather, a dispute would have arisen, at the latest, when [plaintiff] pursued her charge of discrimination with the EEOC. At that point, Bauer had formally brought her allegations to a forum with the potential to resolve the issue and was thus clearly at odds with her employer."

*Papaconstantinou-Bauer* is directly on point with Combs' case here. Her dispute with Netflix arose when Combs filed her Complaint with the DFEH. This Court should follow *Kader*, supra, and *Papaconstantinou-Bauer*, and reverse the district court's order.

Here, the district court correctly noted that the Federal Arbitration Act ("FAA") provides that arbitration agreements generally "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract" (9 U.S.C. § 2).

The district court also acknowledged that a major exception to the enforcement of employment arbitration agreements is the Ending Forced

13

Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (EFAA). The EFAA was enacted March 3, 2022, and is found at 9 U.S.C. § 402.

The EFAA invalidates pre-dispute arbitration agreements for sexual harassment or sexual assault claims that "arise or accrue" on or after March 3, 2022. The law also provides courts, not arbitrators, with authority to decide its applicability. The relevant part here states:

> Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no pre-dispute arbitration agreement or pre-dispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute (9 U.S.C. § 402(a)).

As noted by the district court, the EFAA expressly applies "to any dispute or claim that arises or accrues on or after the date of enactment of this Act" Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022); *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 550 (S.D.N.Y. 2023).

The district court here even acknowledged that "[w]hen a plaintiff brings several claims, some of which are sexual harassment claims and some of which are not, the EFAA precludes arbitration as to *all* claims if the 'core' of the case alleges 'conduct constituting a sexual harassment dispute'" *Arouh v. GAN Ltd.*, No. 8:23-

14

CV-02001- FWS, 2024 WL 3469032, at *6 (C.D. Cal. Mar. 22, 2024) (quoting

*Turner v. Tesla, Inc.*, 686 F.Supp. 3d 917, 925 (N.D. Cal. 2023)).

Courts have held that the term "arises" includes the formation of an

actual *dispute*, not just the *conduct*, especially where the adversarial posture

emerges later. Here, Combs' "dispute" with Netflix began, not when the sexual

misconduct by Netflix employees occurred, but after March 3, 2022, when Netflix

finally responded to Combs' claims, took an opposing position to her, and denied

any wrongdoing or responsibility to Combs.

In *Famuyide v. Chipotle Mexican Grill, Inc.*, No. 231127 (DWF/ECW),

2023 WL 5651915, at *3 (D. Minn. Aug. 31, 2023) the court noted that the term

"dispute" is not defined in the statute, so the court applied the ordinary meaning of

the term: "In a legal context like this one, a dispute is a "conflict or controversy,

esp. one that has given rise to a particular lawsuit." (*Famuyide,* at 898, citing,

*Black's Law Dictionary* 593 (11th ed. 2019, the employer, Chipotle, argued that the

dispute with the plaintiff arose when the sexual misconduct occurred (before the

enactment of the EFAA). However, the court determined that "there was thus no

conflict or controversy between the parties, and no 'dispute' that could have been

submitted to arbitration in February 2022" (*Id.*).

Pursuant to the above case law, Combs' dispute arose, not when the sexual

harassment occurred, nor when Netflix terminated Combs' employment. The

15

dispute arose when Combs' claim and demands were met with disagreement on the other side. Netflix's silence in response to Combs' complaints did not constitute a "dispute." The dispute arose once Combs filed her DFEH complaint in August 2023, and Netflix responded and opposed her position.

## II. THE DISTRICT COURT ERRED BY NOT FOLLOWING THE *KADER* DECISION

The district court relied heavily on *Newcombe-Dierl v. Amgen*, 2022 WL 3012211 (C.D. Cal. May 26, 2022), to find that Combs' claims accrued with her termination in 2021, precluding EFAA coverage. The district court's application of the law was flawed.

In *Newcombe-Dierl,* the plaintiff alleged sex-based discrimination and harassment by her employer Amgen. She was terminated before the EFAA's enactment. Plaintiff attempted to argue that her dispute arose after the law's enactment due to later discovery of evidence. The court disagreed and found that the plaintiff's cause of action occurred when her employment was terminated.

The district court in our case, using *Newcombe-Dierl,* found that Combs' claims with Netflix accrued prior to March 3, 2022, because Combs' workplace harassment occurred in 2018, and her termination occurred in December 2021.

The district court's reliance on *Newcombe-Dierl* is problematic because *Kader v. S. Cal. Med. Ctr., Inc.*, (2024) 99 Cal.App.5th 214, is a much better analog than Newcombe-Dierl to our case. In *Kader*, the employee suffered harassment

16

before March 3, 2022. However, there was no employment action taken against the employee prior to the filing of a DFEH complaint in May 2022, and only then did the employer oppose the claims, creating a dispute.

The *Kader* court held that no "dispute" arose until the employer responded to the DFEH complaint, which by then was after the EFAA's effective date. Thus, arbitration was not enforceable, even though the harassment occurred earlier. The court stated:

> "A dispute arises when one party asserts a right, claim, or demand, and the other side expresses disagreement or takes an adversarial posture" (*Kader*, *supra,* 97 Cal. App. 5th at 222).

As in *Kader*, Combs' dispute arose when she filed her Complaint with the DFEH in August 2023, well after the EFAA's enactment. This is the earliest date that Netflix took an adversarial posture toward Combs' complaints (e.g., denying wrongdoing), thus triggering the EFAA.

*Kader* aligns with the California Supreme Court's precedent in *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, by reinforcing the requirement that arbitration agreements must not only be procedurally fair, but also substantively fair. It meticulously analyzes unconscionability by evaluating both procedural coercion and the one-sided substantive terms that favored the employer.

17

By contrast, *Newcombe-Dierl* gives short shrift to this dual analysis, heavily favoring FAA preemption and minimizing the real-world coercive context in which the arbitration agreement was signed. It treats *Armendariz* as subordinate to federal precedent, rather than as the controlling interpretation of state contract law, which courts must honor even under the FAA.

*Kader v. S. Cal. Med. Ctr.*, Inc. is a better-reasoned opinion because it honors the dual-arm unconscionability framework under *Armendariz*. It engages deeply with the factual realities of employer-employee bargaining dynamics, and it provides a careful, contextualized analysis of fairness in arbitration terms. Additionally, it adheres to the hierarchy of authority under California law.

*Kader* also points out adverse aspects of arbitration for employees, such as the asymmetrical terms (employer's access to courts vs. employee's waiver of rights), arbitrator selection mechanisms favoring the employer, limitations on discovery, and unfair cost-sharing provisions. Never mind the advantage Netflix has in arbitration, due to its repeated use of the same arbitrators.

The court in *Kader* held that the arbitration clause's restrictions rendered the process unfair, especially where discovery was essential to prove claims like harassment or discrimination, as we have here.

*Newcombe-Dierl*, by contrast, brushed past these issues. It treated limitations on discovery and confidentiality provisions as "mere preferences," ignoring how

18

such restrictions disable effective vindication of statutory rights under FEHA in a jury trial. That is in complete opposition with California and federal law's strong public policy protecting workers from discrimination and retaliation.

*Newcombe-Dierl* sacrifices nuance and fails to safeguard the statutory protections California has guaranteed to workers – particularly those situated like Combs. *Kader* is not only more appropriately applied because it is doctrinally superior, but it is more attuned to justice in the employment context as presented by Combs.

Finally, *Kader* is a published California Court of Appeal opinion, binding on lower state courts. *Newcombe-Dierl* is an unpublished federal district court decision, which is not binding even within its own district. *Kader* is thus entitled to more deference as a statement of California law, especially where the enforceability of contracts under *California* unconscionability standards is at issue.

In *Newcombe-Dierl*, the plaintiff did not allege any ongoing dispute or disagreement with her employer before her termination. She suffered an adverse employment action, and that was the end of the interaction.

In contrast, Combs repeatedly complained about harassment during her employment. Combs' complaints were met with silence. The district court here remarkably equated silence with conflict. Netflix's silence was not an "adverse event." It did not create conflict, because mere silence alone is not conflict. But

19

Combs' action of filing a DFEH complaint in August 2023, created the actual dispute with Netflix. Thus, the dispute giving rise to the EFAA's application arose well after the EFAA's enactment.

There is a distinction between "dispute" and "claim accrual." The *Newcombe-Dierl* court collapsed "dispute" and "claim accrual" into the same point in time. The district court made the same mistake, citing *Newcombe-Dierl* for support.

But the district court and the *Newcombe* court's approach ignored the distinction the EFAA itself makes between "arises" and "accrues." Thankfully, courts like the *Kader* court have clarified that a dispute arises only when there is a clash between parties, such as a legal demand and formal opposition – not just the "silent treatment."

## III. THE DISTRICT COURT MISCHARACTERIZED PRE-2022 CONDUCT AS A "DISPUTE"

The district court focused on Combs' internal complaints to Netflix in 2018 and 2021 as evidence that a "dispute" had then arisen. But an employer's silence or inaction is not enough to create a formal dispute under EFAA standards. Courts have rejected this argument. In *Famuyide v. Chipotle Mexican Grill, Inc.*, 2023 WL 5651915 (D. Minn. Aug. 31, 2023), the court clarified that "a dispute requires a right, claim, or demand that is met with disagreement." Therefore, the *mere existence* of a harassment complaint without a formal assertion of legal rights or

20

adversarial action by the employer is insufficient to trigger preclusion under the EFAA. This is what the district court failed to see.

## IV. ARBITRATION SHOULD BE DENIED BECAUSE THE CORE OF THE CASE IS SEXUAL HARASSMENT

Combs has sued Netflix for more than sexual harassment. Even if some claims involve other issues (e.g., breach of contract), however, "When the core factual allegations relate to sexual harassment, arbitration is barred for all claims, even those sounding in tort or contract" (*Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917, 925 (N.D. Cal. 2023)). The court in *Arouh v. GAN Ltd.*, 2024 WL 3469032 (C.D. Cal. Mar. 22, 2024) agreed, stating that the EFAA bars arbitration when sexual harassment is "central, not peripheral."

Here, Combs alleges a sexualized workplace culture, aggressive advances on a work trip, and retaliatory firing for reporting sexual harassment. These are not peripheral issues – they are central. "The right to select a judicial forum, vis-a-vis arbitration, is a 'substantial right,' not lightly to be deemed waived" (*Cisneros, supra,* 97 Cal.App.5th at 461).

## V. POLICY CONSIDERATIONS SUPPORT DENIAL OF ARBITRATION

Congress passed the EFAA explicitly to remove sexual harassment cases from secret arbitration forums and ensure public accountability. Enforcing arbitration here would undermine the remedial purpose of the EFAA, contradict

21

the intent of Congress to protect employees asserting harassment claims post-2022, and chill reporting by future victims if employers can silence disputes retroactively.

**<u>CONCLUSION</u>**

Appellant Jessica Combs' legal dispute arose no earlier than the filing of her 2023 DFEH complaint, well after the EFAA's effective date. The district court's interpretation of the EFAA erroneously conflates internal complaints with adversarial legal disputes.

The core of the case is sexual harassment, and public policy along with precedent (*Kader*, *Turner*, *Arouh, supra*) mandate denial of arbitration under the EFAA. Accordingly, Combs asks that this Court reverse the district court's order compelling arbitration.

Dated: July 25, 2025.  BROWN CLARK LE & CEVALLOS, LLP

By  /s/ Edwin B. Brown
Edwin B. Brown
Attorneys for Appellant
Jessica Combs

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to rule 8.204(c) of the California Rules of Court, I hereby certify that this brief contains 4,785 words, including footnotes. In making this certification, I have relied on the word count of the computer program used to prepare the brief.

Dated: July 25, 2025.                    BROWN CLARK LE & CEVALLOS, LLP


By  /s/ Edwin B. Brown
   Edwin B. Brown
   Attorneys for Appellant
   Jessica Combs

23

## STATEMENT OF RELATED CASES

Appellant is unaware of any other cases related to this case.

Dated: July 25, 2025.                    BROWN CLARK LE & CEVALLOS, LLP


By  /s/ Edwin B. Brown
          Edwin B. Brown
          Attorneys for Appellant
          Jessica Combs

24

# ADDENDUM

## TABLES OF CONTENTS [ADDENDUM]

Federal Rule of Civil Procedure 56(a)................................................................ADD-1

9 U.S.C. § 2................................................................................................ADD-1

9 U.S.C. § 402............................................................................................ADD-1

28 U.S.C. §1332..........................................................................................ADD-2

28 U.S.C. §1291..........................................................................................ADD-2

Cal. Code Civ. Proc. §1294...........................................................................ADD-3

House Judiciary Committee Report (H.R.Rep. No. 117-234)...........................ADD-3

Pub.L. No. 117-90, § 3, 136 Stat. 26, 28 (2022)...........................................ADD-21

**Federal Rule of Civil Procedure 56(a)**

Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

**9 U.S.C. § 2**

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.

**9 U.S.C. § 402**

 (a) Notwithstanding any other provision of this title, at the election of the person her provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no pre-

dispute arbitration agreement or pre-dispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

(b) Determination of Applicability

An issue as to whether this chapter applies with respect to a dispute shall be determined under Federal law. The applicability of this chapter to an agreement to arbitrate and the validity and enforceability of an agreement to which this chapter applies shall be determined by a court, rather than an arbitrator, irrespective of whether the party resisting arbitration challenges the arbitration agreement specifically or in conjunction with other terms of the contract containing such agreement, and irrespective of whether the agreement purports to delegate such determinations to an arbitrator.

**28 U.S.C. §1332**

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between –

(1) citizens of different States;

**28 U.S.C. §1291**

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the

ADD-2

district courts of the United States, the United States District Court for the District

of the Canal Zone, the District Court of Guam, and the District Court of the Virgin

Islands, except where a direct review may be had in the Supreme Court. The

jurisdiction of the United States Court of Appeals for the Federal Circuit shall be

limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this

title.

**Cal. Code Civ. Proc. §1294**

An aggrieved party may appeal from:

(a) An order dismissing or denying a petition to compel arbitration.

(b) An order dismissing a petition to confirm, correct or vacate an award.

(c) An order vacating an award unless a rehearing in arbitration is ordered.

(d) A judgment entered pursuant to this title.

(e) A special order after final judgment.

**House Judiciary Committee Report  (H.R.Rep. No. 117-234)**

ENDING FORCED ARBITRATION OF SEXUAL ASSAULT AND SEXUAL HARASSMENT ACT OF 2021

January 28, 2022.--Committed to the Committee of the Whole House State of the Union and ordered to be printed.

Mr. Nadler, from the Committee on the Judiciary, submitted the following report

ADD-3

together with supplemental views [To accompany H.R. 4445]

The Committee on the Judiciary, to whom was referred the bill (H.R. 4445) to amend title 9 of the United States Code with respect to arbitration of disputes involving sexual assault and sexual harassment, having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

## CONTENTS

|  | Page |
|---|---|
| Purpose and Summary...................................................... | 3 |
| Background and Need for the Legislation.......................... | 4 |
| Hearings............................................................................ | 11 |
| Committee Consideration................................................. | 12 |
| Committee Votes............................................................... | 12 |
| Committee Oversight Findings.......................................... | 19 |
| Committee Estimate of Budgetary Effects........................ | 19 |
| New Budget Authority and Congressional Budget Office Cost Estimate.................................................................. | 19 |
| Duplication of Federal Programs....................................... | 19 |
| Performance Goals and Objectives................................... | 19 |
| Advisory on Earmarks....................................................... | 19 |
| Section-by-Section Analysis............................................. | 19 |
| Changes in Existing Law Made by the Bill, as Reported… | 19 |
| Supplemental Views.......................................................... | 22 |

The amendment is as follows: Strike all after the enacting clause and insert the following:

SECTION 1. SHORT TITLE.

This Act may be cited as the "Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021".

SEC. 2. PREDISPUTE ARBITRATION OF DISPUTES INVOLVING SEXUAL ASSAULT AND SEXUAL HARASSMENT.

(a) In General.--Title 9 of the United States Code is amended by adding at the end the following:

"CHAPTER 4--ARBITRATION OF DISPUTES INVOLVING SEXUAL
ASSAULT AND SEXUAL HARASSMENT

"Sec.401. Definitions.
"402. No validity or enforceability.

"Sec. 401. Definitions

"In this chapter:

(1) "Pre-dispute arbitration agreement." – The term 'pre-dispute arbitration
agreement' means any agreement to arbitrate a dispute that had not yet arisen at the
time of the making of the agreement.

"(2) Pre-dispute joint-action waiver." – The term 'pre-dispute joint-action
waiver' means an agreement, whether or not part of a pre-dispute arbitration
agreement, that would prohibit, or waive the right of, one of the parties to the
agreement to participate in a joint, class, or collective action in a judicial, arbitral,
administrative, or other forum, concerning a dispute that has not yet arisen at the
time of the making of the agreement.

"(3) Sexual assault dispute." – The term 'sexual assault Dispute' means a
dispute involving a nonconsensual sexual act or sexual contact, as such terms are
defined in section 2246 of title 18 or similar applicable Tribal or State law,
including when the victim lacks capacity to consent.

"(4) Sexual harassment dispute." The term 'sexual harassment dispute'
means a dispute relating to the any of the following conduct directed at an
individual or a group of individuals:

"(A) Unwelcome sexual advances.

"(B) Unwanted physical contact that is sexual in nature, including
assault.

"(C) Unwanted sexual attention, including unwanted sexual comments
and propositions for sexual activity.

"(D) Conditioning professional, educational, consumer, health care or
long-term care benefits on sexual activity.

"(E) Retaliation for rejecting unwanted sexual attention.

"Sec. 402. No validity or enforceability

"(a) In General. – Notwithstanding any other provision of this title, at the election
of the person alleging conduct constituting a sexual harassment dispute or sexual
assault dispute, or the named representative of a class or in a collective action

ADD-5

alleging such conduct, no pre-dispute arbitration agreement or pre-dispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

"(c) Determination of Applicability. – An issue as to whether this chapter applies with respect to a dispute shall be determined under Federal law. The applicability of this chapter to an agreement to arbitrate and the validity and enforceability of an agreement to which this chapter applies shall be determined by a court, rather than an arbitrator, irrespective of whether the party resisting arbitration challenges the arbitration agreement specifically or in conjunction with other terms of the contract containing such agreement, and irrespective of whether the agreement purports to delegate such determinations to an arbitrator."

(c) Technical and Conforming Amendments.--
    (1) In general.--Title 9 of the United States Code is amended--
        (A) in section 2, by inserting "or as otherwise provided in chapter 4" before the period at the end;
        (B) in section 208 -
            (i) in the section heading, by striking Chapter 1; residual application" and inserting "Application"; and
            (ii) by adding at the end the following:
        "This chapter applies to the extent that this chapter is not in conflict with chapter 4."; and
        (C) in section 307 -
            (i) in the section heading, by striking "Chapter 1; residual application" and inserting "Application"; and
            (ii) by adding at the end the following: "This chapter applies to the extent that this chapter is not in conflict with chapter 4.".
    (2) Table of sections.-
        (A) Chapter 2. – The table of sections for chapter 2 of title 9, United States Code, is amended by striking the item relating to section 208 and inserting the following:
      "208. Application."
        (B) Chapter 3. – The table of sections for chapter 3 of title 9, United States Code, is amended by striking the item relating to section 307 and inserting the following:
      "307. Application."
    (3) Table of chapters.--The table of chapters for title 9, United States Code, is amended by adding at the end the following:

ADD-6

"4. Arbitration of disputes involving sexual assault and 401" sexual harassment.

SEC. 3. APPLICABILITY.

This Act, and the amendments made by this Act, shall apply with respect to any dispute or claim that arises or accrues on or after the date of enactment of this Act.

Purpose and Summary
        H.R. 4445, the "Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021," would prohibit the enforcement of mandatory, pre-dispute arbitration ("forced arbitration") provisions in cases involving sexual assault or sexual harassment. Over the past several decades, forced arbitration clauses have become virtually ubiquitous in everyday contracts often buried deep within the fine print of employment and consumer contracts, forced arbitration deprives millions of Americans of their day in court to enforce state and federal rights. Because arbitration lacks the transparency and precedential guidance of the justice system, there is no guarantee that the relevant law will be applied to these disputes or that fundamental notions of fairness and equity will be upheld in the process. Furthermore, due to the secretive nature of this system, these disputes are often shielded from public scrutiny.

        Due to the prevalence of these clauses in employment and consumer disputes, victims of sexual violence and harassment are often unable to seek justice in a court of law, enforce their rights under state and federal legal protections, or even simply share their experiences. When an employee who is subject to a forced arbitration clause sues after being raped, assaulted, or harassed at work, the company is entitled, under the Federal Arbitration Act (FAA), to force the suit into arbitration. Similarly, a consumer who signs an arbitration clause and is assaulted at a business can be forced into an arbitration proceeding.

        In many forced arbitration cases, the company is entitled to choose the arbitrator who decides the case, as well as the rules of procedure and evidence that apply, and the distribution of costs of the arbitration. The rules also protect the company by keeping the records of an arbitration secret. Because the records in arbitration are protected, employers that use arbitration clauses in their employment contracts can retaliate against a victim--rather than confront the harasser or the attacker -without fear of their actions becoming public through the courts. The secretive nature of arbitration also prevents victims from sharing their stories. This allows for the growth of office cultures that ignore harassment and

retaliate against those who report it, prevent future victims from being warned about dangerous companies and individuals, and create incentives for the corporate protection of rapists and other serial harassers.

H.R. 4445 would restore access to justice for millions of victims of sexual assault or harassment who are currently locked out of the court system and are forced to settle their disputes against companies in a private system of arbitration that often favors the company over the individual. This critical legislation is supported by a coalition of survivors of sexual harassment or assault and their allies, including the National Center on Domestic and Sexual Violence, the National Coalition Against Domestic Violence, the National Domestic Violence Hotline, the National Network to End Domestic Violence, RAINN, and the Sexual Violence Prevention Association, among others. It is also supported by numerous public interest and advocacy organizations, such as Public Citizen and the American Association of Justice.

Background and Need for the Legislation

Unlike the judicial system--in which courts' decisions are generally public and, by building on precedent, cumulatively create a body of law--the results of arbitration disputes are often kept secret. For example, the arbitration protocols for the American Arbitration Association state that arbitrators of consumer disputes must "maintain the privacy of the hearing to the extent permitted by applicable law." Further, a coalition of state attorneys general--representing all 50 states, the District of Columbia, and several U.S. territories--have similarly noted that arbitration's required "veil of secrecy" applies to workplace sexual harassment claims, which may prevent similarly situated persons from learning of illegal conduct and seeking relief. The coalition referred to this phenomenon as a "culture of silence that protects perpetrators at the cost of their victims." This opacity often prevents others from learning of widespread misconduct. As Terri Gerstein, the Director of the State and Local Enforcement Project at the Harvard Law School Labor and Worklife Program, noted, the secretive nature of arbitration "has allowed outrageous violations, in some cases years of sexual harassment and predation, to remain hidden from view and therefore to continue."

Forced arbitration also lacks many of the procedural safeguards of the justice system. For example, in forced arbitration, a company may increase the expense of bringing a Claim, limit discovery, or eliminate protections related to the geographic proximity of the resolution forum, formal civil procedure rules, access to counsel, and the right to bring similar claims jointly. Additionally, the company

ADD-8

imposing arbitration often selects the presiding arbitrator or arbitration provider, creating a conflict of interest in which the purportedly neutral arbitrator may be motivated by the prospect of obtaining repeat business from the company rather than the desire to fairly assess the claim.

As a result of the decline of enforcement of state and federal statutory protections, forced arbitration makes it more likely that corporate harms and abuse will go unchallenged. As Professor Myriam Gilles testified last Congress, many Companies' arbitration clauses specifically identify federal protections that arbitration makes unenforceable in court, such as rights under the Civil Rights Act of 1964 and the Family Medical Leave Act. In this respect, as Professor Gilles observes, "forced arbitration is not an alternative regime for resolving claims, it is a means of suppressing legal claims altogether." Judge William G. Young, who was appointed by President Ronald Reagan, likewise stated that the proliferation of forced arbitration clauses means that "business has a good chance of opting out of the legal system altogether and misbehaving without reproach." Deepak Gupta, a leading public interest attorney, similarly testified that forced arbitration has undermined the enforcement of statutory He explained:

> As the U.S. Supreme Court has itself acknowledged, the presence of a forced arbitration clause often means that Americans will have no effective method of
> asserting their rights or getting justice under federal laws that could otherwise have been enforced in a court – consumer protection or antitrust laws, for example, or prohibitions on sex or race discrimination. If Congress passes laws that can't be enforced in the real world, what good are those laws?

Although proponents claim that arbitration decreases litigation costs for consumers, consumers often do not receive any benefit of reduced costs through forced arbitration. Instead, arbitration clauses appear to dissuade consumers from adjudicating disputes altogether. Moreover, the lower probability of victory, the lack of class representation, and meager legal fees may also discourage attorneys from representing individuals in arbitration proceedings. As Justice Stephen G. Breyer explained:

> What rational lawyer would have signed on to represent the [plaintiffs] in litigation for the possibility of fees stemming from a $30.22 claim? The realistic alternative to a class action is not 17

million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.

In sum, forced arbitration has transferred the rights of workers and consumers to a secretive, closed, and private system designed by corporate interests to evade oversight and accountability. Unsurprisingly, 84% of Americans across the political spectrum support ending forced arbitration in employment and consumer disputes.

I. Recent Case Law Ignores the Legislative Intent of the Federal Arbitration Act

On February 12, 1925, Congress codified the use of arbitration through the FAA. The FAA was adopted to put arbitration agreements on equal footing with other contracts in certain disputes. The legislative history of the FAA suggests that the law was intended to narrowly apply to disputes between merchants, not between a business and its consumers or workers. In 1967, the Supreme Court characterized the FAA as "plainly designed" to include protections against "captive customers or employees." The Court noted that it was clear from congressional debate on the Act that Congress did not intend for parties with unequal bargaining power to be forced to arbitrate claims on a "take-it-or-leave-it basis":

On several occasions [Members of Congress] expressed opposition to a law which would enforce even a valid arbitration provision contained in a contract between parties of unequal bargaining power. Senator Walsh cited insurance, employment, construction, and shipping contracts as routinely containing arbitration clauses and being offered on a take-it-or-leave-it basis to captive customers or employees. He noted that such contracts "are really not voluntarily (sic) things at all" because ``there is nothing for the man to do except to sign it; and then he surrenders his right to have his case tried by the court." He was emphatically assured by the supporters of the bill that it was not their intention to cover such cases.

Indeed, the drafters of the FAA had made clear that arbitration was not appropriate for substantive questions of law. Julius Henry Cohen, the law's architect, emphasized that it was "not the proper method for deciding points of law of major importance involving constitutional questions or policy in the application of statutes." Arbitration was also rarely invoked in state courts because it was widely considered not to preempt state law. This consensus was supported by

ADD-10

the FAA's legislative history. During hearings on the measure, Cohen testified that "[t]here is no disposition therefore by means of the Federal bludgeon to force an individual State into an unwilling submission to arbitration enforcement."

In a series of decisions beginning in the 1980s, however, the Supreme Court drastically expanded the applicability of the FAA to arbitration clauses in everyday contracts, "push[ing] arbitration into the mainstream." The Court has upheld the enforcement of arbitration clauses even when doing so prevents an individual from vindicating a state or federal statutory right. Furthermore, by imposing arbitration on a "take-it-or-leave-it" basis, large companies have largely eviscerated the congressional intent of arbitration as a voluntary process agreed to between parties of equal bargaining power.

II. The Effect of Forced Arbitration on Statutory Rights of Sexual Assault and Sexual Harassment Victims

Forced arbitration is now widespread in consumer contracts. In many cases, consumers are unaware of forced arbitration clauses in the contracts of commonly used goods and services. These clauses are sometimes hidden inside of envelopes, delivery boxes, and privacy policies.

Forced arbitration provisions imposed on consumers for using everyday goods and services often prevent victims of civil rights violations from pursuing their claims in court. For example, Massage Envy, the country's largest massage chain, forced hundreds of women's allegations of sexual assault into arbitration. In one case, a customer who has alleged that she was sexually assaulted by one of the company's therapists attempted to cancel her monthly membership to Massage Envy for over a year, but was refused unless she agreed to forced arbitration. Another sexual assault survivor said, "I was mortified.... It's just horrifying that they would allow this to happen and then take steps to cover up what is happening" through forced arbitration.

As Gretchen Carlson, an advocate and former Fox News commentator, noted in her testimony during the Antitrust, Commercial, and Administrative Law (ACAL) Subcommittee's hearing on forced arbitration:

> These women put their trust into a company and its employees, only to suffer the trauma of being sexually assaulted and then continue to suffer as the company did little to help them and instead tried to silence

ADD-11

them. Now that these women are seeking public accountability in court, the company is trying to force them into arbitration, because hidden in the fine print of the terms and conditions of the company's app and iPads (used to check in for services) was a forced arbitration clause.

In 2015, the Consumer Financial Protection Bureau (CFPB) found that arbitration has undermined the ability of consumers to seek redress for abusive, anti-consumer practices. Richard Cordray, then-Director of the CFPB, explained that based on this research, the CFPB had concluded that "any prospect of meaningful relief for groups of consumers is effectively extinguished by forcing them to fight their legal disputes as lone individuals." Cordray also warned that "many businesses have sought to use arbitration clauses not simply as an alternative means of resolving disputes, but effectively to insulate themselves from accountability by blocking group claims." Nowhere is this more evident than in sexual violence and harassment cases, where survivors are unaware or will not have access to a repeat offender's history of sexual violence or harassment.

According to a 2017 report by the Economic Policy Institute, 60.1 million workers--the majority of non-union employees in the private sector – have signed away their rights through forced arbitration clauses. As this report notes, this trend has "weakened the position of workers whose rights are violated, barring access to the courts for all types of legal claims, including those based on Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Family and Medical Leave Act, and the Fair Labor Standards Act." When employees work under forced arbitration clauses, they are less likely to win in disputes with their employers, or even to bring them at all. Workers that do enforce their rights in the workplace receive less in damages in arbitration than would have been available in court.

Worse still, forced arbitration clauses in employment contracts are often coupled with non-disclosure agreements, ensuring minimal scrutiny of corporate misconduct. For example, the claims of hundreds of workers at Sterling Jewelers--the parent company of Jared Jewelers and Kay Jewelers – who were victims of "groping and sexual coercion and sexual degradation and rape" in the workplace over a period of years were forced into arbitration. More than 200 women filed statements describing "an atmosphere in which female employees endured unwanted sexual advances from male superiors at the company." These statements from women across the country alleged, among other egregious forms of abuse and

harassment, that male supervisors coerced their female subordinates into performing sexual favors for them in order to receive better jobs or higher pay.

The claims of these women, and nearly 70,000 others who were part of a class action lawsuit against Sterling, were subject to forced arbitration, denying their access to Justice. Sterling, like many other American companies, subjects its employees to forced arbitration, requiring them to waive their rights to pursue their claims in court, including claims of discrimination and sexual harassment. According to a New York Times investigation, this secretive process minimized the company`s exposure to additional claims or public scrutiny. As the report explains:

> Arbitration meant that instead of being heard in a public court, [the victims] had to proceed privately in Sterling's in-house system, called Resolve. The first step of Resolve was an internal investigation. If the employee wasn't satisfied by the results of that investigation, he or she could ask to be heard by a panel of the employee's peers and an employment lawyer, all selected by Sterling. If the employee was still dissatisfied, the case was sent to arbitration. Sterling paid the arbitrator. The hearing`s proceedings were carried out with judicial oversight, but they were done in private, and their outcome was sealed. Afterward, if there was a settlement, the employee often had to sign a nondisclosure agreement that prohibited the employee from speaking about the case again. The benefit of arbitration to the employee was that the claim was usually resolved more speedily. The benefit to the company was that it was resolved in secret. The secrecy was the point .... [I]n arbitration, the proceedings are so secretive that the lawyers weren`t allowed to tell other women in the suit.

In light of these concerns, a coalition of state attorneys general – from all 50 states, the District of Columbia, and several U.S. territories--have written Congress in support of ending forced arbitration in workplace disputes involving claims of sexual harassment.\68\ As this bipartisan coalition notes, "[e]nding mandatory arbitration of sexual harassment claims would help to put a stop to the culture of silence that protects perpetrators at the cost of their victims."

ADD-13

Following a series of high-profile disputes involving sexual and racial harassment, some companies have chosen to voluntarily limit the use of forced arbitration in employment contracts. For example, Google announced that it would no longer include forced arbitration clauses in its employment contracts, following a worldwide walkout to protest the company's handling of sexual harassment claims.

Hearings

For the purposes of clause 3(c)(6)(A) of House Rule XIII, the following hearings were used to develop H.R. 4445:

On February 11, 2021, the ACAL Subcommittee held an oversight hearing entitled "Justice Restored: Ending Forced Arbitration and Protecting Fundamental Rights." The Majority witnesses at the hearing were: Myriam Gilles, Professor of Law, Paul R. Verkuil Chair in Public Law, Benjamin N. Cardozo School of Law; Gretchen Carlson, Journalist and Advocate; and Jacob Weiss, Founder and President, OJ Commerce. The Minority witness at the hearing was G. Roger King, Senior Labor and Employment Counsel, HR Policy Association. There, Ms. Carlson testified about the use of forced arbitration to silence victims of systemic sexual harassment. In her testimony, Professor Gilles similarly explained how forced arbitration "perpetuates the exploitation of women in the workplace by shunting victims into a private system where each is unaware of the other and where the arbitration provider (who is chosen and paid by the employer) lacks authority to remedy systemic and recurring workplace abuse."

On November 16, 2021, the Committee on the Judiciary held a hearing entitled ``Silenced: How Forced Arbitration Keeps Victims of Sexual Violence and Sexual Harassment in the Shadows." The Majority witnesses at the hearing were: Eliza Dushku, Actor, Producer, and Graduate Student; Tatiana Spottiswoode, Law Student, Columbia Law School; Andowah Newton of New York, NY; Lora Henry of Canton, OH; and Professor Myriam Gilles, Professor of Law, Paul R. Verkuil Chair in Public Law, Cardozo School of Law. The Minority witnesses at the hearing were: Anna St. John, President and General Counsel, Hamilton Lincoln Law Institute; and Sarah Parshall Perry, Legal Fellow, Edwin Meese III Center for Legal and Judicial Studies, The Heritage Foundation. During the hearing, survivors of sexual harassment or sexual assault testified about how forced arbitration clauses blocked their ability to seek justice and hold wrongdoers accountable, and shielded this misconduct from public scrutiny.

ADD-14

Committee Consideration

On November 17, 2021, the Committee met in open session and ordered the bill, H.R. 4445, favorably reported with an amendment, by a rollcall vote of 27 to 14, a quorum being present.

Committee Votes

In compliance with clause 3(b) of House Rule XIII, the following rollcall votes occurred during the Committee`s consideration of H.R. 4445:

1. An amendment by Mr. Buck of Colorado to amend the bill`s definition of sexual harassment was defeated by a rollcall vote of 15 to 20. The vote was as follows:
[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

2. An amendment by Mr. Bishop of North Carolina to amend the Federal Arbitration Act to exempt claims related to sexual assault or harassment disputes failed by a rollcall vote of 13 to 24. The vote was as follows:

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

3. The motion to report H.R. 4445, as amended, favorably was agreed to by a rollcall vote of 27 to 14. The vote was as follows:

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

Committee Oversight Findings

In compliance with clause 3(c)(1) of House Rule XIII, the Committee advises that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of House Rule X, are incorporated in the descriptive portions
of this report.

Committee Estimate of Budgetary Effects

Pursuant to clause 3(d)(1) of House Rule XIII, the Committee adopts as its own the cost estimate prepared by the Director of the Congressional Budget Office pursuant to section 402 of the Congressional Budget Act of 1974.

ADD-15

New Budget Authority and Congressional Budget Office Cost Estimate

Pursuant to clause 3(c)(2) of House Rule XIII and section 308(a) of the Congressional Budget Act of 1974, and pursuant to clause (3)(c)(3) of House Rule XIII and section 402 of the Congressional Budget Act of 1974, the Committee has requested but not received from the Director of Congressional Budget Office a budgetary analysis and a cost estimate of this bill.

Duplication of Federal Programs

Pursuant to clause 3(c)(5) of House Rule XIII, no provision of H.R. 4445 establishes or reauthorizes a program of the federal government known to be duplicative of another federal program.

Performance Goals and Objectives

The Committee states that pursuant to clause 3(c)(4) of House Rule XIII, H.R. 4445 improves access to justice for survivors of sexual assault and harassment by allowing these parties to elect arbitration after a dispute has arisen.

Advisory on Earmarks

In accordance with clause 9 of House Rule XXI, H.R. 4445 does not contain any congressional earmarks, limited tax benefits, or limited tariff benefits as defined in clause 9(d), 9(e), or 9(f) of House Rule XXI.

Section-by-Section Analysis

The following discussion describes the bill as reported by the Committee.

Sec. 1. Short Title. Section 1 sets forth the short title of the bill as the "Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021."

Sec. 2. Pre-dispute Arbitration of Disputes Involving Sexual Assault and Sexual Harassment. Sec. 2(a) amends Title 9 of the United States Code by adding at the end "Chapter 4 – Arbitration of Disputes Involving Sexual Assault and Sexual Harassment."

New section 401 defines various terms used under new chapter 4. For example, it defines "sexual assault dispute" as "a dispute involving a nonconsensual sexual act

ADD-16

or sexual contact, as such terms are defined in section 2246 of title 18 or similar applicable Tribal or State law, including when the victim lacks capacity to consent." The term "sexual harassment dispute" means a ``dispute relating to any of the following conduct directed at an individual or a group of individuals: (A) Unwelcome sexual advances; (B) Unwanted physical contact that is sexual in nature, including assault; (C) Unwanted sexual attention, including unwanted sexual comments and propositions for sexual activity; (D) Conditioning professional, educational, consumer, health care or long-term care benefits on sexual activity; or (E) Retaliation for rejecting unwanted sexual attention."

New section 402 first provides that at the election of a person alleging conduct that constitutes a sexual harassment or sexual assault claim, no pre-dispute arbitration agreement or pre-dispute joint-action waiver shall be valid or enforceable relating to disputes described within the chapter. It further provides that a court, and not an arbitrator, shall determine whether this chapter applies to an agreement to arbitrate, and the enforceability of that agreement.

Section 2(b) makes a series of technical and conforming amendments.

Sec. 3. Effective Date. Section 3 provides that the legislation applies to any dispute or claim that arises or accrues on or after the date of enactment of the legislation.

Changes in Existing Law Made by the Bill, as Reported

In compliance with clause 3(e) of House Rule XIII, changes in existing law made by the bill, H.R. 4445, as reported, are shown as follows:

Changes in Existing Law Made by the Bill, as Reported

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, and existing law in which no change is proposed is shown in roman):

TITLE 9, UNITED STATES CODE

Chap.                                                                    Sec.
    General provisions...............................................1

ADD-17

\* \* \* \* \* \* \*

Arbitration of disputes involving sexual assault and sexual harassment.................................................401

CHAPTER 1--GENERAL PROVISIONS

\* \* \* \* \* \* \*

Sec. 2. Validity, irrevocability, and enforcement of agreements to arbitrate

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.

\* \* \* \* \* \* \*

CHAPTER 2--CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS

Sec.201. Enforcement of Convention.

\* \* \* \* \* \* \*

[208. Chapter 1; residual application.]

208. Application.

\* \* \* \* \* \* \*

Sec. 208. [Chapter 1; residual application

Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States. This chapter applies to the extent that this chapter is not in conflict with chapter 4.

\* \* \* \* \* \* \*

ADD-18

CHAPTER 3--INTER-AMERICAN CONVENTION ON INTERNATIONAL COMMERCIAL ARBITRATION

Sec. 301. Enforcement of Convention.

\* \* \* \* \* \* \*

[307. Chapter 1; residual application.]

307. Application.

\* \* \* \* \* \* \*

Sec. 307. [Chapter 1; residual application]  Application

Chapter 1 applies to actions and proceedings brought under this chapter to the extent chapter 1 is not in conflict with this chapter or the Inter-American Convention as ratified by the United States. This chapter applies to the extent that this chapter is not in conflict with chapter 4.

CHAPTER 4 – ARBITRATION OF DISPUTES INVOLVING SEXUAL ASSAULT AND SEXUAL HARASSMENT

Sec.401. Definitions.

402. No validity or enforceability.

Sec. 401. Definitions

In this chapter:

(1) Pre-dispute arbitration agreement.--The term "pre-dispute arbitration agreement" means any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement.

(2) Pre-dispute joint-action waiver.--The term "pre-dispute joint-action waiver" means an agreement, whether or not part of a pre-dispute arbitration agreement, that would prohibit, or waive the right of one of the parties to the agreement to participate in a joint, class, or collective action in a judicial,

ADD-19

arbitral, administrative, or other forum, concerning a dispute that has not yet arisen at the time of the making of the agreement.

(3) Sexual assault dispute.--The term ``sexual assault dispute'' means a dispute involving a nonconsensual sexual act or sexual contact, as such terms are defined in section 2246 of title 18 or similar applicable Tribal or State law, including when the victim lacks capacity to consent.

(4) Sexual harassment dispute – The  term "sexual harassment dispute" means a dispute relating to the any of the following conduct directed at an individual or a group of individuals:

(A) Unwelcome sexual advances.

(B) Unwanted physical contact that is sexual in nature, including assault.

(C) Unwanted sexual attention, including unwanted sexual comments and propositions for sexual activity.

(D) Conditioning professional, educational, consumer, health care or long-term care benefits on sexual activity.

(E) Retaliation for rejecting unwanted sexual attention.

Sec. 402. No validity or enforceability

 (a) In General.--Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no pre-dispute arbitration agreement or pre-dispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

 (b) Determination of Applicability – An issue as to whether this chapter applies with respect to a dispute shall be determined under Federal law. The applicability of this chapter to an agreement to arbitrate and the validity and enforceability of an agreement to which this chapter applies shall be determined by a court, rather than an arbitrator, irrespective of whether the party resisting arbitration challenges the arbitration agreement specifically or in conjunction with other terms of the contract containing such agreement, and irrespective of whether the agreement purports to delegate such determinations to an arbitrator.

Supplemental Views

ADD-20

Although I am recorded as a No on final passage of H.R. 4445, the "Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021," I intended to vote Yes" Burgess Owens, Member of Congress.

**Pub.L. No. 117-90, § 3, 136 Stat. 26, 28 (2022)**

[117th Congress Public Law 90]
[From the U.S. Government Publishing Office]
[[Page 25]]

ENDING FORCED ARBITRATION OF SEXUAL ASSAULT AND SEXUALHARASSMENT ACT OF 2021

[[Page 136 STAT. 26]]

Public Law 117-90
117th Congress

An Act

To amend title 9 of the United States Code with respect to arbitration of disputes involving sexual assault and sexual harassment. <<NOTE: Mar. 3, 2022 - [H.R. 4445]

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, NOTE: Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021.

SECTION 1. 9 USC 1 SHORT TITLE.

This Act may be cited as the "Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021".

SEC. 2. PREDISPUTE ARBITRATION OF DISPUTES INVOLVING SEXUAL ASSAULT AND SEXUAL HARASSMENT.

   (a) In General. Title 9 of the United States Code is amended by adding at the end the following:

ADD-21

"CHAPTER 4: 9 USC 401 prec. ARBITRATION OF DISPUTES INVOLVING SEXUAL ASSAULT AND SEXUAL HARASSMENT

Sec. 401. Definitions.

"402. No validity or enforceability.
"Sec. 401. 9 USC 401. Definitions

"In this chapter:

 "(1) Pre-dispute arbitration agreement. The term 'pre-dispute arbitration agreement' means any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement.

"(2) Pre-dispute joint-action waiver. The term 'pre-dispute joint-action waiver' means an agreement, whether or not part of a pre-dispute arbitration agreement, that would prohibit, or waive the right of, one of the parties to the agreement to participate in a joint, class, or collective action in a judicial, arbitral, administrative, or other forum, concerning a dispute that has not yet arisen at the time of the making of the agreement.

"(3) Sexual assault dispute. The term 'sexual assault dispute' means a dispute involving a nonconsensual sexual act or sexual contact, as such terms are defined in section 2246 of title 18 or similar applicable Tribal or State law, including when the victim lacks capacity to consent.

"(4) Sexual harassment dispute. The term 'sexual harassment dispute' means a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law.

 [Page 136 STAT. 27]

"Sec. 402: 9 USC 402. No validity or enforceability

"(a) In General. Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no pre-dispute arbitration agreement or pre-dispute joint-action waiver shall be valid or enforceable with respect to a case which is filed

ADD-22

under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

"(b) Contracts. Determination of Applicability. – An issue as to whether this chapter applies with respect to a dispute shall be determined under Federal law. The applicability of this chapter to an agreement to arbitrate and the validity and enforceability of an agreement to which this chapter applies shall be determined by a court, rather than an arbitrator, irrespective of whether the party resisting arbitration challenges the arbitration agreement specifically or in conjunction with other terms of the contract containing such agreement, and irrespective of whether the agreement purports to delegate such determinations to an arbitrator."

 (c) Technical and Conforming Amendments.

     (1) In general. Title 9 of the United States Code is amended -

        (A) in section 2, by inserting "or as otherwise provided in chapter 4" before the period at the end;
        (B) in section 208
           (i) in the section heading, by striking "Chapter 1; residual application" and inserting "Application"; and
           (ii) by adding at the end the following:
           "This chapter applies to the extent that this chapter is not in conflict with chapter 4."; and
        (C) in section 307--
        (i) in the section heading, by striking Chapter 1; residual application" and inserting "Application"; and
        (ii) by adding at the end the following: "This chapter applies to the extent that this chapter is not in conflict with chapter 4."

     (2) Table of sections. -
        (A) Chapter 2. The table of sections for chapter 2 of title 9, United States Code: 9 USC 201 prec.is amended by striking the item relating to section 208 and inserting the following: "208. Application."
        (B) Chapter 3. The table of sections for chapter 3 f title 9, United States Code: 9 USC 301prec. is amended by striking the item relating to section 307 and inserting the following: "307. Application."

     (3) Table of chapters. The table of chapters for title 9, United States Code 9 USC 1 is amended by adding at the end the following:

ADD-23

"4. Arbitration of disputes involving sexual assault and sexual harassment 401"

[[Page 136 STAT. 28]]

SEC. 3. 9 USC 401 APPLICABILITY.

This Act, and the amendments made by this Act, shall apply with respect to any dispute or claim that arises or accrues on or after the date of enactment of this Act.

Approved March 3, 2022.

LEGISLATIVE HISTORY – H.R. 4445 (S. 2342):

HOUSE REPORTS: No. 117-234 (Comm. on the Judiciary).

CONGRESSIONAL RECORD, Vol. 168 (2022):

> Feb. 7, considered and passed House.
> Feb. 10, considered and passed Senate.

DAILY COMPILATION OF PRESIDENTIAL DOCUMENTS (2022):

> Mar. 3, Presidential remarks.